OPINION
{¶ 1} Appellant, 9533 Basil Western Road, LLC ("Basil Western LLC"), appeals from the judgment of the Franklin County Court of Common Pleas, which approved a *Page 2 
court-appointed receiver's request to cancel a lease in which Basil Western LLC has an interest. For the following reasons, we reverse the judgment of the trial court.
 {¶ 2} This appeal arises from a complaint filed by plaintiff-appellee, Kelley Norris, against defendant-appellee Rick Dudley and corporate defendants-appellees 007 Holding Corporation ("007"), 008 Holding Corporation ("008"), and Who Land, LLC ("Who Land LLC"), on January 27, 2005. The complaint stated that Norris and Dudley were each a 50 percent shareholder in each of the corporations; that 007 owned and operated a restaurant known as O'Bar; that 008 owned and operated a restaurant known as Club Charts; and that Who Land LLC owned the land on which Club Charts was located. According to the complaint, the corporations were operating at a loss, and Dudley had assumed exclusive control of daily business operations. Because "[t]he two shareholders cannot agree on handling the affairs of the businesses and are at a deadlock," Norris sought judicial dissolution of the corporations and the appointment of a receiver "to handle the affairs of the corporations until sold."
 {¶ 3} The following day, Norris moved for appointment of a receiver. Norris reiterated her allegations concerning Dudley's actions and noted that criminal charges were pending against her and Dudley for non-payment of corporate sales taxes. She stated that she was unable to sell assets to pay the taxes because Dudley had excluded her from all business activities.
 {¶ 4} After Norris filed the complaint and moved for appointment of the receiver, the court entertained numerous motions and requests from the parties. We will limit our discussion to the actions most relevant to this appeal. *Page 3 
 {¶ 5} On February 2, 2005, the trial court issued an order appointing Martin Management Services, Inc., as the receiver pursuant to R.C.2735.01. The order authorized the receiver "to do all things necessary to take control of the businesses and property" of the corporations and to "do all things necessary to effectuate an ultimate sale thereof."
 {¶ 6} On April 1, 2005, the court issued an order approving the receiver's application to sell real property owned by Who Land LLC located at 9645 Basil Western Road and to enter into a listing agreement with an initial listing price of $1.2 million. Dudley opposed the request.
 {¶ 7} Dudley filed his answer to Norris' complaint on May 16, 2005, and he denied the substantive portions of the complaint. Dudley also filed a cross-claim for a part of any sales proceeds.
 {¶ 8} On August 11, 2005, the receiver applied for approval to sell the assets of 008 and Who Land LLC, including the land located at 9645 Basil Western Road and the liquor permit for Club Charts, for $1.25 million. On September 28, 2005, the receiver filed an amended application, which requested approval to sell the assets and real estate for "the reduced sum of $1.225 million." That same day, the court issued an order approving the sale for $1.225 million. The court noted that the sales proceeds would be sufficient to satisfy most, but not all, of the corporations' debts. Thereafter, in April 2006, the court also approved the sale of 007's assets, including O'Bar's assets and liquor permit, for $32,500.
 {¶ 9} On May 24, 2006, the receiver applied for court approval to reject two leases upon the Who Land LLC property, i.e., the property approved for sale at $1.225 *Page 4 
million. The receiver explained that, when a title search was conducted for purposes of the sale, the search revealed two leases on the property. The first, a billboard lease originating in 1979, has apparently expired, and it is not in dispute in this case. The second, a billboard lease originating in 2001, is the subject of the dispute on appeal. As to that lease, we have gleaned the following facts from the record.
 {¶ 10} Prior to 2001, George and Karen Fee owned about 13 acres of real property located at 9645 Basil Western Road in Canal Winchester, Ohio. In 1999, the Fees entered into a five-year billboard lease that covered a 20-foot by 80-foot portion of their 13 acres. We will refer to this lease as the "Billboard Lease."
 {¶ 11} The Fees thereafter carved out 2.845 acres from their 13-acre property, sold that 2.845 acres to Who Land LLC, and, on July 11, 2001, conveyed that 2.845-acre parcel to Who Land LLC by general warranty deed "for valuable consideration paid." That same day, Who Land LLC entered into a lease agreement with the Fees, whereby Who Land LLC leased the 20-foot by 80-foot Billboard Lease portion of the 2.845 acres back to the Fees for a period of 50 years. The agreement allowed the Fees to use the Billboard Lease property to maintain an outdoor advertising sign or structure. Norris and Dudley both signed as representatives of Who Land LLC. We will refer to this lease agreement as the "Who Land Lease."
 {¶ 12} Thereafter, the Fees assigned their interest in the Who Land Lease to Makdrew Development Company, Ltd., as part of a sale of the adjacent acreage. Makdrew thereafter assigned its interest in the Who Land Lease to Basil Western LLC. Basil Western LLC, through counsel, appeared in the trial court and opposed the receiver's request for approval to reject the Who Land Lease. *Page 5 
 {¶ 13} As noted, the receiver learned of the Who Land Lease through a title search conducted for purposes of the court-approved sale of the 9645 Basil Western property, Who Land LLC's only asset. Upon learning of the Who Land Lease and the above-noted expired lease, the receiver and the buyer executed an addendum (dated September 30, 2005) to the purchase agreement, whereby both parties agreed to waive any demands to cure the title in exchange for a reduction in the purchase price by $25,000. The receiver agreed to use all reasonable efforts to have the leases removed. The original purchase agreement provided for the buyer's counsel to hold $50,000 in escrow until certain debts had been paid and the liquor permit renewal for the property had been approved. The addendum provided that the buyer's counsel would continue to hold the $50,000 in escrow until the receiver was successful in removing the leases or the receiver obtained "a judicial determination at the trial court level that said lease(s) are valid and shall remain of record, despite Receiver's best efforts." If the latter contingency occurred, and the receiver was unsuccessful in convincing the trial court to reject the leases, then the receiver would have no obligation to appeal that adverse ruling.
 {¶ 14} Before the trial court, the receiver argued that the court should permit him to cancel the Who Land Lease and extinguish Basil Western LLC's interests because the lease was of no benefit to the receivership estate and created potential liability. Relying on case law supporting the right of a receiver to reject lease agreements, the receiver argued that he had no obligation to perform "any executory contracts" if it would be unprofitable to do so. Here, he argued, the Who Land Lease required no *Page 6 
rental payments during the term of the lease and no assurance that either party (Who Land LLC or the Fees) would pay liability insurance for the property.
 {¶ 15} In response, Basil Western LLC argued that the Who Land Lease was not an executory contract because the parties had fulfilled their contractual obligations at the outset. The Who Land Lease provided, in pertinent part:
 2) Consideration. Landlord [Who Land LLC] and Tenant [the Fees] agree that there shall be no rental paid by [the Fees] under this Agreement and the consideration for this Agreement is [the Fees'] agreement to sell the Premises to [Who Land LLC] for the purchase price and on the other terms set forth in the Contract.
Thus, argued Basil Western LLC, Who Land LLC received consideration for the 50-year Who Land Lease as part of the purchase of the 2.845-acre parcel, and no part of the lease agreement was left to execute. Therefore, any authority the receiver had to reject an executory contract was inapplicable. In addition, Basil Western LLC argued, rejection of the lease would be inequitable to the assignees of the Who Land Lease, and a windfall to the receiver, because payment had already been made.
 {¶ 16} On April 18, 2007, the trial court issued a decision and entry granting the receiver's request to reject and cancel the Who Land Lease. In its decision, the court found "that the purported lease does not offer any benefit to the receivership and may in fact pose a risk of liability." The court cancelled the Who Land Lease as it related to the Fees and all successors in interest.
 {¶ 17} Basil Western LLC filed a timely appeal and raises the following assignment of error:
 The lower court erred in granting the Receiver's Motion for Court Approval to Reject Certain Leases Upon Real Property on April 18, 2007. *Page 7 
 {¶ 18} Within the assignment of error, Basil Western LLC raises two issues: first, that there was no evidence to support the trial court's decision; and second, that the Who Land Lease was executed, not executory, and the receiver had no power to reject it. We begin with the powers of a receiver appointed by a trial court under these circumstances.
 {¶ 19} Ohio courts have frequently recognized a trial court's discretion to appoint a receiver. See, e.g., State ex rel. Celebrezze v.Gibbs (1991), 60 Ohio St.3d 69, 73, and cases cited therein. R.C.2735.01(E) specifically authorizes a common pleas court to appoint a receiver in cases where "a corporation has been dissolved, or is insolvent, or in imminent danger of insolvency, or has forfeited its corporate rights."
 {¶ 20} R.C. 2735.04 also provides:
 Under the control of the court which appointed him, as provided in [R.C. 2735.01], a receiver may bring and defend actions in his own name as receiver, take and keep possession of property, receive rents, collect, compound for, and compromise demands, make transfers, and generally do such acts respecting the property as the court authorizes.
 {¶ 21} The Supreme Court of Ohio has interpreted R.C. 2735.04 "as enabling the trial court to exercise its sound judicial discretion to limit or expand a receiver's powers as it deems appropriate."Celebrezze at 74. And, absent a showing that the trial court has abused its discretion in that respect, we will not disturb the court's judgment. Id; Campbell Investors v. TPSS Acquisition Corp.,152 Ohio App.3d 218, 2003-Ohio-1399, at ¶ 15.
 {¶ 22} Both parties here cite Wilder v. McDonald (1900),63 Ohio St. 383, as relevant authority for considering whether the trial court properly allowed the receiver to *Page 8 
reject the Who Land Lease. In brief, the underlying dispute inWilder concerned property that plaintiffs/lessors leased to Mr. Neff, who agreed to pay rent and to pay taxes on the property. Mr. Neff defaulted on the lease by failing to make such payments, and he thereafter assigned all of his property interests to his creditors. After the lease expired, plaintiffs/lessors sued Mr. Neff's assignees/creditors for the unpaid rent and taxes. The trial court found, and the appellate court affirmed, that the assignees/creditors were not liable for such payments.
 {¶ 23} On appeal to the Supreme Court of Ohio, the court noted the general principle, arising from United States Trust Co. v. Wabash W. Ry.Co. (1893), 150 U.S. 287, and other sources, that "`an assignee or receiver is not bound to adopt the contracts, accept the leases, or otherwise step into the shoes of the assignor, if in his opinion it would be unprofitable or undesirable to do so; and he is entitled to a reasonable time to elect whether to adopt or repudiate such contract.'"Wilder at 395, quoting United States Trust Co. at 299. The court went on to find that the assignees/creditors had not accepted Mr. Neff's lease when he assigned his property interests to them, that they had expressly rejected acceptance of the lease, and that they had not taken possession of the leased premises. Therefore, the assignees/creditors were not liable for the rent and taxes Mr. Neff owed.
 {¶ 24} Importantly, however, the court also stated that the outcome would have been different if, instead of suing the assignees/creditors for the rent owed, the plaintiffs/lessors had made a claim for a share of any distribution from Mr. Neff's property. The court explained:
 * * * For the assignment [from Mr. Neff to his creditors] did not terminate the lease, nor discharge the obligation of the *Page 9 
lessee to pay the rents, taxes, and charges according to its covenants. On the contrary, these obligations continued to be a liability of the lessee which might be made the basis of a valid claim by the lessors, as general creditors, entitling them to share, in the proper order, in the distribution of the fund that came to the hands of the assignees in virtue of the assignment. * * *
 {¶ 25} Thus, while upholding the general principle that an assignee (or receiver) may reject a lease, the court in Wilder also upheld the principle that the lease was still enforceable against the original lessee and, therefore, could serve as a basis for a claim against any distribution of the lessee's property.
 {¶ 26} In Marshall v. Walter A. Caverly Co. (1907), 18 Ohio Dec. 157, 5 Ohio N.P. (n.s.) 185, the court distinguished between individual assignees, like those individuals at issue in Wilder, and a receiver. The court explained that, as an officer of the court, a receiver is not the agent or representative of either party to the action. Rather, "it is the duty of the receiver to take possession of leased property and he does not by so doing become the assignee of the term, but holds the property * * * as the hand of the court and is entitled to a reasonable time to ascertain its value and determine whether or not he will accept it." Id., 18 Ohio Dec. at 159. Applying this principle, the court inMarshall upheld a receiver's power to pay rent under an existing lease for a limited period of time and then reject the remainder of the lease term. The receiver's rejection of the lease, however, did not remove the lessors' claim against the assets of the original lessee for "their pro rata share on distribution for the remainder of the [lease] term." Id. at 160.
 {¶ 27} In Dissolution of Charles F. Johnson, Inc. (App. 1936), 22 Ohio Law Abs. 534, 1936 Ohio Misc. LEXIS 1018, this court upheld the right of a receiver to reject an *Page 10 
executory contract, that is, a contract by which a party agrees to do, or not to do, something in the future. The court relied onWilder and other authorities for the principle that a receiver need not adopt or perform executory contracts and need not "`otherwise step into the shoes of the person for whom he is appointed receiver, if, in his opinion, it would be unprofitable or undesirable to do so.'" Id. at 20, quoting 34 O.J. 1020. While the specific contract at issue may or may not have been performed in some respects, it required a payment of $124,000 in the future and, therefore, was executory "in part at least." Id. at 21. Therefore, the reviewing court found that the trial court acted within its discretion when it directed the receiver to reject the continuation of the contract.
 {¶ 28} Importantly, the court in Dissolution of Johnson also noted that the trial court had "very properly saved all rights of the appellants to any and all obligations of the corporation to them by reason of the breach of any of the conditions of the contract to be performed by the corporation." Id. at 22. The trial court had done so by including in its entry an instruction that the receiver was to apply to the court for instructions regarding the allowance of any claims arising from the contract. By doing so, this court held, the trial court "left open to the appellants their right to have any and all claims accruing in their behalf from the contract with the corporation determined and all damages resulting to them fixed." Id.
 {¶ 29} We find similar principles at work in more recent bankruptcy proceedings. As the Sixth Circuit Court of Appeals explained in In reTerrell (C.A.6, 1989), 892 F.2d 469, under certain circumstances, federal law allows a trustee or debtor to assume or reject an executory contract, subject to court approval. In this context, "[r]ejection of an executory contract serves two purposes. It relieves the debtor of burdensome future *Page 11 
obligations while he is trying to recover financially and it constitutes a breach of a contract which permits the other party to file a creditor's claim." In re Norquist (Bankr.Ct.E.D.Wash.1984),43 Bankr. 224, 225-226.
 {¶ 30} To consider such issues, federal courts must frequently determine whether a particular agreement is "executory" within the bankruptcy context, and these same courts have debated the proper standards for doing so. See, e.g., Phar-Mor, Inc. v. Strouss Bldg.Assoc. (N.D.Ohio 1997), 204 B.R. 948, 951-953, and cases cited therein. It appears that, in most cases, courts have focused on the obligations left to be performed under the contract. See, e.g., In re Johnson
(C.A.10, 2007), 501 F.3d 1163 (finding automobile retail installment contract executory where only remaining obligations were debtors' obligation to make installment payments and seller's obligation to release title upon full payment); Dick v. Conseco, Inc. (C.A.7, 2006),458 F.3d 573 (finding employee benefit agreement was not executory where only remaining obligation was submission of insurance premiums); andIn re Terrell (finding land contract was executory because both parties had material obligations left to perform). Other courts have focused on the nature of the agreement. See, e.g., In re Kane (C.A.1, 2000),248 B.R. 216 (noting disagreement among courts as to whether installment land sale contracts are executory and finding contract at issue was not executory because the transaction was essentially a real estate sale). See, also, Kunkel v. Sprague Natl. Bank (C.A.8, 1997), 128 F.3d 636 (in context of determining priority under Uniform Commercial Code, stating that contract is not executory simply because it has not been fully performed by payment, if all acts giving rise to payment obligation have been performed). *Page 12 
 {¶ 31} Here, appellant offers Black's Law Dictionary (7th Ed.1999) 321, which defines "executory contract" as "[a] contract that remains wholly unperformed or for which there remains something still to be done on both sides, often as a component of a larger transaction." In response, the receiver offers Cassella v.Tiberio (1948), 150 Ohio St. 27, in which the Ohio Supreme Court stated: "`An executory contract is one in which a party binds himself to do, or not to do, a particular thing, whereas an executed contract is one in which the object of the agreement is performed and everything that was to be done is done.'" Id. at 30, quoting 12 American Jurisprudence, 507, Section 9.
 {¶ 32} Despite both parties' assertions to the contrary, however, we conclude that the Who Land Lease does not fit neatly into any of these definitions. Therefore, with all applicable statutory, common law, and equitable principles in mind, we consider the facts of the case before us in the context of the receiver's specific duties. As defined by the trial court, those duties are to "take control of the businesses and property" of the corporate defendants-appellants, to "do all things necessary to effectuate an ultimate sale" of that property, "to distribute and divide the sales proceeds" of the corporate assets, to pay the outstanding corporate debts, and to "divide the proceeds pursuant" to the court's order.
 {¶ 33} The record shows that the Fees and Who Land LLC entered into two agreements whereby the Fees sold 2.845 acres of property to Who Land LLC and Who Land LLC leased back to the Fees the 20-foot by 80-foot portion of the property subject to the Billboard Lease. Together, these agreements make clear that the parties figured consideration for the Who Land Lease into the purchase price of the 2.845 acres. Thus, *Page 13 
both parties had performed their substantial obligations under the contract: Who Land LLC granted a 50-year lease for a limited use of the 20-foot by 80-foot property, and the Fees paid for that limited use as part of the property sale. The remaining terms — the limitation on the use of the property solely for outdoor advertising, the lease's subordination to any mortgage on the property, and the tenant's right to sublease the property — while continuing to exist, do not impose substantial obligations, in comparison. Therefore, while the Who Land Lease is executory in the sense that the obligations imposed by the lease have not yet expired, we conclude that the Who Land Lease was not an executory contract the receiver was free to reject.
 {¶ 34} Furthermore, we conclude that the trial court had no basis upon which to conclude that the Who Land Lease, whether executed or executory, offered no benefit or created liability. The Who Land Lease states that the parties agreed to enter into their agreement pursuant to the "Real Estate Purchase Contract dated April 13, 2001" and that consideration for the lease is the Fees' agreement to sell the property for the purchase price "and on the other terms set forth in the Contract." Our record does not contain a copy of the April 13, 2001 real estate contract or the details of that transaction, including the purchase price. The record does not disclose the value of the 20-foot by 80-foot Billboard Lease property or the potential value of the Who Land Lease itself.
 {¶ 35} Presumably, the trial court could have made certain findings about the value of the lease property, and its impact on the value of the entire property, based on the recent purchase agreement entered into by the receiver and the buyer and the subsequent addendum to that agreement. Under the approved purchase agreement, the buyer agreed to purchase the entire 2.845 acres, including the existing business *Page 14 
and liquor permit, for $1.225 million. After learning of the leases, including, most importantly, the Who Land Lease covering the Billboard Lease property, the buyer and the receiver executed an addendum, which lowered the sale price by $25,000. The buyer and the receiver also agreed that the $50,000 already in escrow would remain there while the receiver used his best efforts to remove the leases. However, if the receiver were unsuccessful at getting the trial court to approve the rejection of the leases, he would be under no obligation to appeal that adverse ruling. These documents serve as evidence that the existence of the lease reduced the value of the 2.845 acres by at least $25,000, but they shed no light on whether or how this reduced value compares to the value figured into the real estate transaction between the Fees and Who Land LLC. And they provide no evidence that the receiver could not fulfill his obligation "to effectuate an ultimate sale" of the property, when the parties knew of the lease before the court approved the sale, and the buyer's agreement to purchase the property remained in tact, albeit with a lower purchase price.
 {¶ 36} The receiver notes that the Who Land LLC does not disclose which party must maintain insurance on the Billboard Lease property or even whether one of the parties has been maintaining such insurance. In this respect, the receiver states: "The Lease between Who Land LLC and Basil Western provides that `[throughout the Term, Tenant or Subtenant may keep in full force and effect public liability insurance.'" (Emphasis deleted.) (Appellee's Brief at 4.) However, the copy of the Who Land Lease contained in the record before this court (R. 104, Exhibit I) — and, presumably, the same copy provided to the trial court — contains no such provision. But even this provision would not determine whether anyone is, in fact, keeping public liability insurance in *Page 15 
effect for the 20-foot by 80-foot lease property. Thus, while the trial court concluded that the Who Land Lease "may" pose a risk of liability, it had no evidence on which to characterize or quantify that risk as it related to a lack of insurance.
 {¶ 37} Likewise, the receiver argues that the Who Land Lease is silent as to which party to the lease must pay the property taxes. However, the receiver offered no evidence as to the amount of taxes owed on the 20-foot by 80-foot property, whether the amount of the taxes was figured into the purchase price when Who Land LLC purchased the entire property in 2001, or whether or how these taxes figure into the receiver's satisfaction of the corporate tax debts. Therefore, the court had no evidence on which to conclude that the Who Land Lease was burdensome because of an alleged, undefined, tax obligation.
 {¶ 38} Finally, we discern no consideration for the existence or satisfaction of Basil Western's interests or investment. InWilder, the court noted that the outcome would have been different if the lessor had attempted to recover against the original lessee's assets, rather than the assignees. In Marshall, the court similarly upheld a receiver's authority to reject leases, even after maintaining the lease for a certain period of time, but did so while recognizing the lessors' ability to recover the remaining rent as creditors. And, inDissolution of Johnson, the court characterized the lease at issue as executory and affirmed the receiver's authority, subject to court approval, to reject it, but the court also noted that the trial court had "very properly saved" the lessors' rights to recover against the contracting corporation. In contrast, here, the trial court's decision did not account for the breach of contract the rejection would cause or Basil Western's ability to recover against Who Land LLC's assets for that breach. *Page 16 
 {¶ 39} For these reasons, we conclude that the trial court abused its discretion when it approved the receiver's request to reject the Who Land Lease. Accordingly, we sustain appellant's assignment of error.
 {¶ 40} Having sustained appellant's assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas.
Judgment reversed.
 BRYANT and BROWN, JJ., concur. *Page 1